May it please the Court, with the Court's permission I'd like to argue from the table so I can have assistance with my notes. Thank you. My name is Tim Fox. I represent the appellants in this case. With me today is my law partner, Amy Robertson. The question presented here is whether Title II of the Americans with Disabilities Act or California's Unrest Civil Rights Act prohibit California's long-term care insurance program from refusing to provide any coverage whatsoever to persons with designated medical conditions. The Court below erred in granting summary judgment on our UNRRA claims for two reasons. First, California insurance law requires insurers to provide coverage to persons with disabilities for all expenses other than those that directly result from their disabilities. Is there a difference in this particular insurance program and the programs on which you are relying? No, Your Honor. The basis... Isn't this package, everybody covered uses income from everybody from the receipts? So it's a self-insured package. Exactly. That isn't the format of the California... This is self-insured package. No, this is self-insured. Otherwise, if the money runs out, there's no money left for anybody else. And the statute, the California insurance statute that we rely on for the proposition that they must provide coverage for all expenses other than those related to the person's disabilities is a self-insured statute. It applies explicitly to self-insured employee welfare benefit plans. In order to reveal, what do you have to satisfy the Court? Of what fact must you satisfy the Court? We have two arguments. One is a legal argument, which I'll come back to in a second, but in response to your question, factually, we must show that there are disputed issues of material facts that precluded the lower court from granting summary judgment because the underwriting guidelines that were used by the insurers are arbitrary. Arbitrariness means that UNRRA is violated, and if a state statute is violated by an insurance practice, then the insurance safe harbor provision of the ADA no longer applies. So we rely on the factual proposition that it's arbitrary. The underwriting guidelines are arbitrary because they treat the risk characteristic of medical condition differently from other risk characteristics that pose similar or greater risk of needing long-term care. I guess you're relying on the fact that they include smokers and yet they, in your view, I gather, smokers provide the same. I don't know how you have read what you've said, but the fact that they cover smokers means that it's arbitrary? Yes. Doesn't it boil down to that as we read your argument? Again, there's a separate matter of law argument that I'll get to in a second, but the question you're presenting concerns our argument that there's various characteristics that increase a person's risk of needing long-term care. Smoking is one of them. Gender is another. Marital status is another. Most significant is age. In order for underwriting criteria to be rational, and this is set forth in Actuarial Standard of Practice 12, you have to treat similar characteristics in a similar manner. If you've got one characteristic that puts somebody at significant risk, it's not consistent with standards of practice to have that risk characteristic exclude somebody from an insurance program while a similar characteristic that poses equal risk is not excluded. So our argument here is that the insurance program treats several different characteristics in a manner different than it treats the risk characteristics of medical conditions. Counselor? Yes, Your Honor. What case or statute are you relying on to say that the insurer cannot exclude your client? We are relying on California Insurance Code Section 10123.2. And I want to make clear, we are not arguing that they can't that they're required to accept our clients for all purposes. We're simply saying that based on Section 10123.2, they have to at least provide insurance covering costs that don't result from their disabilities. There's a really good example of this concept, which is our clients, the appellants, are at no greater risk of being in a car crash and needing long-term care insurance because they're in a car crash than anybody else in the population. Now, my clients have post-polio syndrome and diabetes. Under this theory, if they needed long-term care because of their disabilities, CalPERS would not have to cover any cost whatsoever out of that. It's a limited theory. It's not a requirement that they let everybody in and that they let them in for all purposes. I don't think the judge knows that there's something that's magnifying what happens in our chambers. That's what. We hear your turn of pages, and I thought that might be the thing, but that's what it is. It's just that. All right. And so what we are really, I really want to focus on that argument. And let me say that we made an argument in our brief that we're stepping back from, and that was that the Ninth Circuit's decision in Lovell requires CalPERS to let everybody in for all reasons. I don't think that's a fair characterization of Lovell. Lovell did not consider the safe harbor provision of the ADA. But what is clear is that California legislature has seen fit, in Section 10123.2 of the Insurance Code, to require self-insured employee welfare benefit plans like this plan to cover the expenses of persons with physical disabilities except when those expenses result from the disability. Again, this is a fairly limited statute. We're not asking that the insurers cover all expenses, only those expenses that don't result from the disability. Well, this, okay, diabetes. If someone is in a car accident and falls asleep at the wheel and is in a car accident, your position would be, well, if the person, if it's traceable to the diabetes, then they're not eligible? Yeah, most car crashes are not going to be the result of their disability. I suppose you could... Well, you can easily conceive of a situation where it would be. Yes, you could. And that is going to present an issue of causation that the insurance company is going to have to work through. But that's true with any plan that's covered by Section 10123.2. The legislature has created this requirement, and it's not a sufficient basis to ignore that requirement to say that sometimes it's going to be hard to meet. You know, it may be the case that with an attenuated fact situation, you're going to have hard questions of causation. Was the expense the result of a disability or not? But that's envisioned by the nature of the statute, and the statute's out there, so it must mean something. And so we argue that in this case... It means you can't discriminate. Absolutely, Your Honor. But in order for us to find this is discrimination, what steps must we go through as we review? The facts aren't in dispute, are they? The facts, we believe that the facts, that there is a genuine dispute of facts. What fact is in dispute? The question, the lower standard in evaluating our factual argument applied the wrong legal framework. The Supreme Court said that we needed to present medical evidence that shows that the appellants would have actually been accepted into the program absent the arbitrary guidelines. But that's not our burden. The Supreme Court made it absolutely clear in the Northeastern and the Adirondack cases that in a case like this where the plaintiffs allege that they were judged based on discriminatory criteria, that's what we allege. Well, but isn't a risk... Isn't it standard that insurance plans can reject people on the basis of there being too high a risk? Not in California. Not in this limited circumstance. 10123.2 says that covered insurers cannot refuse to provide insurance coverage covering expenses not resulting from the person's disability. Counsel? Yes, Your Honor. How does insurance code section 10144 interplay with the section you just cited? Because that appears to say that insurance is prohibited from refusing insurance except when that refusal is based on sound actuarial principles or related to anticipated experience. How do those two statutes interrelate in your opinion? Thank you, Your Honor. 10144 is one of the statutes in California that prohibits certain types of insurance practices. It prohibits exactly what you just described, which are decisions that aren't based on sound actuarial principles or recently anticipated experience. It's not the only prohibition on insurance practices in California. A second prohibition is found in section 10123.2, which says you can't, if you're a self-insured employee welfare benefit plan, refuse to provide coverage for those expenses not resulting from the person's disability. So there's two different prohibitions. But how do we read those together? Because our charge was to read all of the statutes so as to give infection to all of them. So this 10144 seems to be more specific on this subject. And how do we apply both of these so as to consider them both in making our rulings? Your Honor, I think that one of the tasks of statutory interpretation is to give meaning to both. So 10123.2 has to have some meaning. It can't be sitting out there without meaning. One way to reconcile both of those statutes is to recognize that no risk makes someone uninsurable. That's not a radical concept. That's a concept that Judge Posner pointed out in the Doe case. It's a concept that's reflected in the legislative history of the ADA, in the Department of Justice interpretation of the ADA, and in the California statute 10123.2. So when you're looking at 10144, you can reconcile those two statutes by saying that California has recognized in 10123.2 something that's implicit in 10144, which is you should not be able to say, I'm not going to cover risks that are unrelated to a person with disabilities. We would also argue that 10144 here was violated because, again, there is no, we are simply asking for coverage of expenses not directly resulting from a disability. It can't be consistent. I'm sorry, I'm interrupting you. Did you have a question? I'm sorry. Thank you, Your Honor. It is not. UNRRA, and this is the argument that they've denominated as a standing argument in their brief, which applies to Title II, and in their letter brief to this Court, they argue the same thing under UNRRA. But it's very clear that simply because a benefit or claim arose in the context of employment does not mean that it falls outside of Title II or UNRRA. This Court made that clear in the Hasen case, and the California Court of Appeals made that clear with respect to UNRRA in the Alch case. Instead, the Court must analyze the nature of the benefit at issue, and it's a very similar analysis under those two statutes. Under Title II, the Court should look at whether or not the benefit constitutes an output of a public entity, and under UNRRA, it's a follow-the-cash-flow analysis. Is the cash going out from the entity, which would suggest an employment relationship, or is it coming into the entity, which would suggest some other relationship that would be covered by UNRRA? Here, both tests are met, because this is clearly something that is offered by a public entity to eligible recipients, and the flow of cash is from the members of the long-term care plan to the public entity. Sorry, Your Honor. I'm sorry. In Title I, it's clear, though, that insurance benefits such as insurance are considered part of the employment context. So why should the ADA do it in the Title II context? Because the ADA is organized around relationships. As you just pointed out, when there's a relationship between an employer and employee, it's Title I. Title II is public entity and a person with disability. Title III is public accommodation and persons with disability. It's the nature of the relationship that determines which title is implicated. Here, there is no dispute that the insurers do not employ the appellants. There is no employment relationship here, and any contrary holding would result in some absurd results. For example, Ms. Saldana and any other relative who's in this plan or who applied for the plan could not have a Title I claim, because with respect to the plan, they're not employees and the state is not their employer. So there would be no Title I claim. In addition, you can think of kind of the absurd consequences that would occur when, if you had an analysis as suggested by the insurers here, in which the particular ADA title turns on whether or not a benefit arises by virtue of employment. I'll give you a quick example. My time is short. Employers often give as perks to their employees, they pay for parking at a parking garage. Normally, a lawsuit brought by a disabled individual against a parking garage would be under Title III. But the proposed standard by the insurers here, if the disabled customer got the parking by virtue of his or her employment, suddenly that would transform that case into a Title I case. And that means that all of the regulations that have been carefully crafted over the years under Title III that tell you how wide a parking space should be, what the cross-slope should be, all of those would be out the window, simply because the disabled customer got the parking space by virtue of his or her employment. The court would then be required to apply Title I regs, which really have nothing to do with accessibility. Well, counsel, maybe I'm not understanding your argument. But the district court said that 10123.2 relates to hospital, medical, or surgical expenses and that this is not that. And then the district court said that the statute provides that no person shall be enrolled unless he or she meets the underwriting criteria established by the board. And so the court concluded that it wasn't convinced that California state law requires defendants to offer them long-term care coverage not covered by their disabilities. So where did the district court go wrong exactly? First, in finding that 10123.2 does not apply on the grounds that the expenses here were not medical expenses. We've given numerous examples in our brief of the expenses that are medical expenses that are covered by this plan. For example, again, I'll be brief. The plan provides coverage for nursing home expenses. The plan defines a nursing home as a facility primarily engaged in providing nursing services on a 24-hour basis under the supervision of a physician. The triggering requirements to obtain benefits under the plan are that, number one, they be medically necessary, and number two, that the individual meet the definition of being chronically ill. So we're talking about, by definition of the plan, expenses that are medically necessary for chronically ill people. These encompass numerous medical expenses. So the court went wrong in not recognizing the type of expenses. The second way the court went wrong is in looking at Section 21661, which does indeed require underwriting. We're not contesting that point. But nothing in there, in the fact that they have to underwrite, means that their discretion to underwrite is limitless. We know that from Section 21661H, same statute. Subsection H says that they have to have, quote, appropriate, end quote, guidelines. Now, the statute doesn't define the word appropriate, but under any definition of that term, that has to mean that the underwriting guidelines comply with other applicable California statutes, including Section 10123.2. I'd like to reserve the rest of my time. Thank you. That was helpful. Thank you. Terry Senni. Good morning, Your Honors, and may it please the Court. I am Terry Senni, Deputy Attorney General, and it's my great privilege to appear in this Court on behalf of the defendants and the appellees of the California Public Retirement System and the Long-Term Care Group. It really is the undisputed facts in this case that not only justify, but that compel the rejection of the challenge to California's long-term care program, as the district court found. And I don't want to belabor the facts because, as the Court appropriately recognized, they really are largely undisputed in this case. But it's extremely important to bear in mind at all stages of analysis in this case that both plaintiffs who present here suffer from extremely serious medical conditions. In the one case, post-polio syndrome with many complications. In the other case, a diabetes I in very poor control with rather recent episodes of serious problems, including loss of consciousness that resulted in hospitalization, end organ damage that responded slowly to antibiotic treatment. And this constellation of extremely high-risk applicants brings into bear the safe harbor provision of the ADA, as well as the implementing statute for the California long-term care program itself. I may not understand Mr. Fox's position, but as I gather his position is, you can take that into consideration in fixing the cost, in fixing this. In other words, the solution isn't exclusion. The solution is adjustments of certain type. Now, is that do I miss his point? Well, that, of course, is what they're advocating. What we're suggesting is that might be a policy judgment that Congress could have reached or that the California legislature reached, but it is not, in fact, the judgment that they reached. What the ADA did in promulgating the self-harbor provision, it said outright that this legislation was not intended to interfere with the traditional functioning of reasonable and rational insurance underwriting and eligibility standards and the application of those standards. The plaintiffs have virtually conceded that the ADA safe harbor provision would bar their claim, but they tried to get around the safe harbor position by saying, well, those underwriting standards have to be either mandated by or consistent or not inconsistent with state law. So then we turn immediately to state law. And the most direct, specific, and applicable provision to be found in state law is, of course, in the statute that created the Public Employees Long-Term Care Act itself. And the language in that state statute admits of no ambiguity. No one can reasonably say we don't know what it means when the legislature said that, first of all, the Cal Board, the Board of CalPERS, has the right to promulgate eligibility and underwriting standards. But not only that, it also mandated that individuals who do not satisfy those eligibility and underwriting standards cannot be enrolled into the program. Sotomayor, are you indirectly addressing the argument that 10123.2 covers this because this is really hospital, medical, and surgical expenses, and so therefore you have to let them in? I mean, I'm not quite sure I understand how that provision in your argument relates to this. Well, let me turn to that and explain how we believe that that interrelates with the government code section that created the long-term care program. Section 10123.2 of the insurance code we do not believe even applies to this government-created long-term care program for two reasons. First of all, it's not a self-insured employee welfare benefit plan. It is self-insured, to be sure, but it's not an employee welfare benefit plan. Such a plan, first of all, anyone who applies to the CalPERS long-term care program must be accepted. If they are accepted, they entirely fund the premiums. The employer contributes absolutely nothing, at least in the period of time that we're talking about in this case, for the cost of administration, for benefits, for claims, absolutely nothing. So it's not an employee benefit plan in this instance. For example. Counsel. Yes. Where are you taking the definition of self-insured employee benefit plan? Where are you drawing the definition from? It's not separately defined in the insurance code, Your Honor, with the exception of the statute in the insurance code that seems to deal specifically with maternity and sterilization procedures and things of that nature. So I am depending primarily on the intrinsic plain meaning of those words. But there's a second and even more important reason why 101 to 3.2 does not apply, and that is that it only provides coverage for hospital, medical, or surgical expenses. Now, that is surely a phrase of art, and it's generally understood to mean major medical coverage or health coverage. That's not what we have here. The only thing that triggers eligibility for benefits in a long-term care program is if someone experiences either a loss of cognitive functioning capacity or a diminution in their capacity to handle the activities of daily living. But long-term care includes hospital, medical, surgical expenses, doesn't it? I don't think it would under any circumstances include hospital or surgical expenses. Some of the expenses it might end up paying for could be characterized as medical in nature, to be sure. But it's not the incurring of a medical expense that triggers eligibility. A perfectly bona fide member of the LTC plan could incur a host of medical expenses and present them to a long-term care insurer, and they would be rejected unless those services were specifically provided to assist in dealing with the deficits of cognitive or ADL impairment. So to try to pigeonhole long-term care insurance benefits into the definition of insurance or 10123.2 is a stretch at best. But let me just... Is it your argument that no medical care is provided in a long-term care setting? No. Some of the care that is provided in a long-term care setting would be medical in nature, but that's not... It's being medical in nature is not what makes it covered. What makes it covered is the fact that that service was provided to assist to compensate with the loss of cognitive functioning or the loss of ADA capacity. So that when... I'll work for a case. The statute or regulation says that. Says? That it has to be attributable to the loss of cognitive functioning. That is described in the declarations of Dr. Stephen Holland, the Chief Medical Director of the Long-Term Care Program. It is also described in the declaration of Dr. Elliot, which we provided in support of our summary judgment motion and in opposition to the plaintiff's... It's a statutory interpretation that we have to make. So the declaration is not really answering the question in terms of whether or not the plain language of the statute covers medical care. I'm sorry. I thought you were asking, Your Honor, what I was relying on for the triggering mechanism for long-term care coverage. That is a matter of policy language, and those experts set that forth, and that's not disputed at all in this case. My difficulty with your argument is that I thought you were trying to interpret the statutory language to see whether or not medical treatment is encompassed in long-term care. Well, and let me reiterate that expenses that could be characterized as medical are sometimes covered and sometimes not, but the fact that they... If they're sometimes covered and sometimes not covered, doesn't that mean that the statute is not allowed to capture them? No, Your Honor, because we believe that this phrase, hospital, medical, or surgical expenses, I mean, there are insurance policies that specifically are designed to cover that, and those are, in common parlance, major medical policies or health policies. That's not what we have here. But let me go one step further and point out to the Court that even if 10123.2 of the insurance code was thought to be applicable despite my arguments to the contrary, it clearly would be superseded by the enabling statute for the Long-Term Care Act itself, which expressly provided that no one shall be enrolled if they do not meet eligibility and underwriting criteria. The legislature knew about this insurance code statute, which had existed for 20 years before the... You're saying that these are two different concepts. I think they are, but even if they weren't, the Long-Term Care Act provision, which is much more specific and speaks specifically to eligibility requirements, would surely trump this provision of the insurance code. Let me just turn ever so briefly to the argument that counsel made regarding smoking, gender, marital status, and age, because I think that there is an illegitimate attempt being made here to paint with such a broad brush that the meaning of underwriting and actuarial assessment would no longer make any sense. If you look carefully at what the plaintiff's sole expert said in this regard, he said, first of all, he had no criticism whatsoever of how the LTC program treated smoking or gender or marital status or age. He also had no criticism whatsoever of the particular underwriting decisions that were made in this case. He couldn't say that rejecting Ms. Saldana or rejecting Mr. Neely was in any way unreasonable, that it wasn't in any way based on a reasonable assessment of the likelihood to come into premature benefit status. All that he really said was, well, we know that smoking is an increased risk. We know that gender seems to be associated with risk. We know that marital status seems to be associated with risk, and the same for age. And so his argument seems to be, if a program recognizes any risk factor and fails to make that factor a criteria of declination, that then the program is just arbitrary. So he tries to cast this broad-brush label of arbitrary on our underwriting standards. Maybe I misunderstood him, but I think he was more narrow than that. I think what he was saying was, similar or of equal concern, rather than just any one. And he's trying to, I think he's arguing, these are similar and of equal concern, they're covered, we ought to be covered, too, and if we're not, then it's arbitrary. And that's what I understand. But what's missing in that argument, when it's a fatal omission, is any evidence that any of these factors, smoking, marital status, or gender, or age, pose an equivalent risk, as do the plaintiff's particular medical profiles. And in the absence of that evidence of equivalence, and he certainly admitted he couldn't say that, because he had no qualification to assess their risk level at all, then it just doesn't make any sense to say that a program that excludes the perceived high risk is being arbitrary if it doesn't also exclude the low risk. I mean, that's what underwriting does, is it makes differentiations between levels of risk, and sets standards, in this case of eligibility, or ineligibility, if that risk level is too high, so as to pose a threat to the financial integrity of the program. And the evidence in this record is completely undisputed that to accept individuals posing a medical risk as high as that represented by the plaintiff's profiles would turn this into an experimental long-term care program. It would undermine the actuarial soundness of the program, and that the result of doing so might very well be one of the difficulties and threats, indeed, to the very viability of the program that those would entail. That evidence is undisputed here. It's provided by Dr. Holland, it's provided by Dr. Elliott, it's provided by our actuary, Mr. Gordon Trapnell, and those opinions are completely undisputed. So what the plaintiffs are really inviting this court to do is to be the first court in the United States to go out on a limb and to say that we are going to require you, California, to accept all applicants, however high their risk, whatever financial impact that may have on your program, despite the clear language of the Long-Term Care Act itself, and despite the safe harbor provision. Yes, Your Honor. We believe Title II does not apply because the long-term care program is not an output of a public entity. This is not a for-profit insurance program that has been set up by the state and which invites members of the general public to apply. This is a program which is entirely self-funded by certain California employees, and they are eligible for the program only by virtue of, in this case, the employment with the State of California of Mr. Neely. But for his employment there, neither he nor Ms. Saldana nor her mother could have applied for this program. So although it is not an employment benefit, per se, it is a program that eligibility is tied to employment. Unless Your Honors have any further questions, I would submit. Any further questions? I want to focus the brief time I have left on two points. First, with respect to whether this is the appropriate title. I take it that Mr. Senna is arguing that this should have been a Title I, and that employees who are never employed by California, never sought to be employed, would have a valid Title I claim. That is not the relationship at issue here. This is a Title II relationship. And second, with respect to 10123.2, my colleague candidly acknowledged that some of the costs covered are indeed medical costs. That, under the plain language of the statute, and of course the interpretation of Section 10123.2, must begin with the plain language. That means that that plan is covered by 10123.2. The only other question, is there a way to harmonize that statute with Section 21661, the statute that governs underwriting of this long-term care plan? There is. The fact that they must engage in underwriting doesn't mean that they have absolutely no limits on their discretion in underwriting. 21661 does not mean, for example, that they could exclude people because of their religion or their political affiliation. The fact that they engage in underwriting does not say anything about limits on that underwriting, and we submit that Section 10123.2 is a limit. But counsel, in this case, there is no obligation that your clients are excluded based on religion or anything of that nature. It was certainly an underwriting decision on death or risk. Isn't that true? Yes, it was an underwriting decision that was inconsistent and violation of 10123.2 because they were not allowed coverage for costs not resulting from their disability. Thank you, Your Honor. Thank you, counsel. Thank you. The case just argued is submitted for decision. The Court appreciates the quality of argument presented on both sides. And that concludes the Court's calendar for this morning. The Court stands adjourned. This Court for this session stands adjourned.
judges: Schroeder, Farris, Rawlinson